## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 12-10967-RGS

### CLAUDIA DiBLASI

v.

### LIBERTY MUTUAL GROUP INC.

## MEMORANDUM AND ORDER ON
## MOTION FOR SUMMARY JUDGMENT

April 3, 2014

STEARNS, D.J.

Defendant Liberty Mutual Group Inc. (Liberty) employed plaintiff Claudia DiBlasi as a Senior Product Analyst from January 19, 2008, until August 1, 2011, when it terminated her for poor performance. DiBlasi brought this lawsuit on April 20, 2012, in the Norfolk Superior Court, alleging that Liberty had violated the Family and Medical Leave Act (FMLA) (Count III) by "using her taking of FMLA leave as a negative factor in evaluating her performance, considering raises and annual bonus," and by "discourag[ing]" her from taking leave. First Am. Compl. ¶¶ 53-54. DiBlasi also claims that Liberty had failed to pay her for overtime in violation of the Massachusetts Wage Law, Mass. Gen. Laws ch. 151, § 1A (Count I) and the Fair Labor Standards Act, 29 U.S.C. § 207(a) (Count II).

Liberty timely removed the case from the State Court on May 31, 2012, invoking federal question jurisdiction. On February 25, 2013, DiBlasi moved to amend her Complaint by adding claims for handicap discrimination under Mass. Gen. Laws ch. 151B (Count IV) and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112 (Count V).[1] In those claims, DiBlasi alleges that Liberty unlawfully terminated her despite her status as a qualified handicapped employee who was capable of performing the essential functions of her job. Sec. Am. Compl. ¶¶ 81, 85. DiBlasi asserts that Liberty failed to provide her with a reasonable accommodation for her handicap and ultimately terminated her "based on performance warning and/or probationary periods during which [her] handicap was not either accommodated at all, or effectively not accommodated because her workweek had been reduced but her workload not decreased by the same proportion." *Id.* ¶¶ 82, 86. Liberty now moves for summary judgment. Argument on the motion was heard on February 11, 2014.

## BACKGROUND

The following facts are derived from Liberty's Statement of Material

---

[1] On May 25, 2012, DiBlasi filed a Complaint with the Massachusetts Commission Against Discrimination (MCAD) alleging disability discrimination in violation of 42 U.S.C. § 12112 and Mass. Gen. Laws ch. 151B. On September 12, 2012, she filed a Withdrawal Form with the MCAD stating her desire to proceed by way of a lawsuit.

Facts (SOF), DiBlasi and Liberty's counterstatements, and the Second Amended Complaint.

### *Job Performance*

In January of 2009, DiBlasi began working as a Senior Product Analyst in the "state management group" within Liberty Mutual's product division.[2] The state management group monitored Liberty's personal insurance products for their competitiveness. The group consisted of teams of analysts and actuaries, each assigned to oversee a multi-state market. Each team was led by a Manager of Product Analysis who worked closely with Liberty's Director of State Operations (DSO).

DiBlasi describes her job as primarily "applying rate increases dictated by higher-level management to Liberty Mutual's insurance products"; "preparing paperwork for state Departments of Insurance (DOI) to implement rate increases to insurance products" as dictated by the DSO; "implementing regulatory and compliance changes to insurance products with language provided *verbatim* from Liberty's Legal Department"; and compiling data on

---

[2] Liberty Mutual classifies jobs on a numerical scale, based on the job's duties and significance, as well as on the experience and qualifications expected of the employee. Renee Miltz, Liberty's Manager of Compensation Operations, testified that in 2010, the jobs scale was scored from 3 to 27. The higher the score, the higher compensation paid to the employee who occupied the position. Miltz Aff. ¶ 5. DiBlasi's position was assigned grade 15.

3

competitors' rate filings.[3] *See* Pl.'s Opp'n at 2 (emphasis in original). DiBlasi admits that she made recommendations about the distribution of premium increases in effectuating a rate increase. *Id*. at n.1. However, she claims having had no responsibility "for initiating inquiries or analyses," nor "authority to make decisions relating to products, marketing and/or any other aspect of Liberty Mutual's business." Sec. Am. Compl. ¶ 16. DiBlasi was paid an annual salary of $88,000 ($3,384.62 per bi-weekly pay period); she was not paid overtime when she worked in excess of forty hours in a week.

From January of 2009 to September of 2009, DiBlasi's team was led by Laura Downey. DiBlasi states that her relationship with Downey was congenial despite Downey's "repeated[] fail[ure] to respond to [her] requests for . . . means to keep her leg elevated while at work." DiBlasi asserts that elevation was needed for her deep vein thrombosis,[4] so DiBlasi made do with an

---

[3] While Liberty accepts DiBlasi's counter-description of her job duties for purposes of this motion, in its SOF it contends that DiBlasi's "most important job duty was to analyze and research internal data and market trends for personal insurance products in her assigned states and to ensure that Liberty achieved strong results in those states and its products remained competitive." Def.'s SOF ¶ 10; *see also* Downey Aff. ¶ 5.

[4] DiBlasi states that the deep vein thrombosis "was presumably related, at least in part, to the hormonal treatment she was receiving for her endometriosis." Pl.'s Opp'n at 3. Downey testified that she arranged for an ergonomic consultation when DiBlasi requested a footrest, but that DiBlasi "never informed her that she had any kind of medical condition that might

4

overturned recycling bin.

Downey testified that, while working for her, DiBlasi developed a "strained relationship" with Denise Kelly, Director of State Operations for Washington who complained to Downey about DiBlasi's work performance, including "her failure to meet deadlines generally and . . . omissions that made her analysis unusable." Downey Aff. ¶ 13. Downey told DiBlasi that she needed to warn her of any anticipated difficulties in meeting deadlines and that missing deadlines was unacceptable. *Id.* ¶ 12. In her midyear evaluation of DiBlasi in the summer of 2009, Downey wrote that her performance "met all expectations."[5] On occasion, Downey permitted DiBlasi to work from home. Downey Aff. ¶ 10.

In September of 2009, DiBlasi was transferred to a new state management team headed by Gifford Sommerkamp and DSO Allison Morabito.[6] In early December of 2009 and January of 2010, Sommerkamp,

---

affect her job performance." Downey Aff. ¶ 20.

[5] Liberty disputes DiBlasi characterization of the review. However, Liberty contends that, because of statute of limitations issues, DiBlasi's first six months on the job are immaterial to its summary judgment motion.

[6] Downey testified that "[i]n an effort to help DiBlasi succeed in her job, and in part due to her strained relationship with Kelly, the company decided to assign different state responsibilities to DiBlasi." *Id.* ¶ 14. According to DiBlasi, she was transferred to the new team because of a need for a more experienced analyst. DiBlasi Aff. ¶¶ 27-28.

5

in consultation with Downey, prepared DiBlasi's first year-end performance review (OSPE). The OSPE identified seven performance objectives that DiBlasi was expected to attain.[7] *See* Sommerkamp Aff. Ex. 8. DiBlasi acknowledged that her OSPE portrayed her as an employee, who despite her knowledge and cooperative attitude, had difficulties with time management and accuracy. *See* DiBlasi Dep. - Ex. 6. Sommerkamp testified that, given her grade level, DiBlasi's overall performance fell below his expectations.[8] In written

---

[7] The objectives were as follows:

1. Manage and execute state review process; 2. Provide analysis, recommendations and reports that effectively influence business decisions and processes of the state(s) and other functional areas of SBU. When applicable, drive the implementation; 3. Manage new/enhanced product implementation; 4. Effectively participate in state(s) business planning process; 5. Develop and maintain competitive intelligence and understand market trends; 6. Monitor and analyze state legislative and regulatory process (if necessary), and ensure compliance with State rules and regulations; and 7. Formally mentor junior employees, as applicable.

Sommerkamp Aff. Ex. 8.

[8] As an example, Sommerkamp cited a project that he assigned to DiBlasi in November of 2009, to analyze the rate at which Liberty was retaining automobile insurance customers in Colorado, New Mexico, and Oklahoma (her assigned states). DiBlasi failed to complete the project by deadline. Sommerkamp claims that DiBlasi's progress "was so slow that [he] asked a colleague to perform the analysis for Colorado." Sommerkamp Aff. ¶ 14. In November of 2010, DiBlasi "failed to meet a deadline for completing a presentation regarding Liberty Mutual's conversion rate in New Mexico. The presentation she ultimately completed did not contain any recommendations

6

comments on the review form, Sommerkamp noted that DiBlasi needed to develop "an increased sense of urgency [and] focus more on the detail of her work products to reduce the number of errors in her work." *Id.* He stated that he expected DiBlasi to supplement her work with additional analysis and recommendations and to put "extra effort into her analysis and ensuring the accuracy of her data and recommendations going forward." *Id.*

DiBlasi's overall evaluation score was 95, on the low side of Liberty's "Range of Effective Performance." In its "Performance Continuum Descriptions," Liberty states that a 90-96 range indicates that the employee "met some critical objectives" and "met some other objectives" resulting in a "mixed or inconsistent contribution to the unit, given the role." Van Parys Aff. - Ex. A. On February 9, 2010, Sommerkamp met with DiBlasi to discuss her review. DiBlasi wrote in the OSPE's comment section that she "was shocked by both the numeric rating and comments," and that she "does not believe that [she] received a fair review."[9] *Id.* On February 15, 2010, DiBlasi informed

or conclusions." *Id.* ¶ 19. DiBlasi, for her part, claims that "Sommerkamp expanded the scope of the project thereby preventing [her] from ever completing it." DiBlasi Aff. ¶ 61.

[9] In its SOF, Liberty Mutual states its expectation that DiBlasi's reports would include not merely an identification of trends, but also an analysis of the causes of those trends and recommendations as to whether and how Liberty Mutual should respond to them, e.g., by charging a different rate for a specific

7

Sommerkamp that she would be taking FMLA leave. They met again on February 16, 2010, to discuss DiBlasi's comments on her OSPE. DiBlasi received a reduced bonus and no raise.

## *Medical Leave Request*

On June 22, 2010, DiBlasi filed a written request for FMLA leave beginning June 30, 2010. DiBlasi was granted leave and received short term disability benefits, which were extended at her request, until she returned to work on August 23, 2010. Liberty Mutual asserts that "[t]his is the only FMLA leave DiBlasi ever requested . . . ." Def.'s SOF ¶ 55.

DiBlasi claims that she had first been scheduled for surgery in November of 2009, and that she had discussed the date with Sommerkamp, although she was ineligible for FMLA leave at that time. The surgery was rescheduled for March of 2010, and then for July of 2010. Pl.'s Resp. ¶ 53. Sommerkamp acknowledges receiving an email from DiBlasi on February 15, 2010, informing him that she "will be out of the office for approximately two weeks due to surgery," and that the surgery was scheduled for March 11, 2010. Ultimately, DiBlasi filed a request with Liberty for FMLA leave in June of 2010, which was

---

type of coverage. Liberty SOF ¶ 18. *See also* Downey Aff. ¶ 9; Sommerkamp Aff. ¶ 10. DiBlasi responds that this expectation was never communicated to her, Dkt #35-1 at 17, although her claim is contradicted by her OSPEs.

8

granted. She underwent surgery on June 30, 2010.

DiBlasi alleges that Sommerkamp was "displeased" when she went out on disability, referring to her leave as a "vacation" and complaining about the "disrupti[on] to [team] projects and flow of work." DiBlasi Dep. at 67. DiBlasi asserts that Sommerkamp "balked" at approving leave for her follow-up physical therapy sessions. Liberty responds that only one of her therapy appointments was eligible for FMLA leave.

### *Post-surgery Events*

After the June 30, 2010 surgery, DiBlasi was absent from work for approximately two months. Sommerkamp contends that after her return in late August, DiBlasi continued to underperform in the critical areas of accuracy, timeliness, and analysis. In November of 2010, DiBlasi failed to meet a deadline for completing a presentation regarding Liberty's conversion rate in New Mexico. Sommerkamp testified that the presentation that DiBlasi ultimately completed failed to include any recommendations. Sommerkamp testified that he "had a number of meetings [in 2010] with her in which [he] discussed [his] ongoing concerns with her performance." Sommerkamp Aff. ¶ 12. DiBlasi disputes the number. There is documentation in the record of a December 16, 2010 meeting between Sommerkamp and DiBlasi regarding her "performance plan." The following day, Sommerkamp sent an email to DiBlasi

9

discussing her performance failures, citing specific examples, and suggesting remedial measures.

In January of 2011, Sommerkamp met with DiBlasi to discuss her second annual performance review. The OSPE listed the same objectives as the prior review. Again, DiBlasi received a rating of 95, which is on the lower end of the range of "effective performance."[10] *See* Sommerkamp Aff. - Ex. 4. DiBlasi complained to Sommerkamp that the negative performance review, in part, was based on her inability to participate in planning meetings because of her FMLA leave. In response, Sommerkamp amended the OSPE to remove comments regarding her lack of "participation" but left her rating unchanged.

On February 18, 2011, Sommerkamp met with DiBlasi to deliver a formal written warning regarding her performance. The warning identified specific examples of deficiencies and set thirty-day targets for improvement, cautioning that absent progress, "further job action may be taken up to and including

---

[10] Among Sommerkamp's critical comments in DiBlasi's 2010 evaluation was the observation that while DiBlasi "has done well on some projects, particularly research projects and projects with well-defined processes; she has struggled with some projects with deliverables that are not part of a defined process and projects that are less-structured (e.g. NM conversion and NM retention ). These types of projects are critical to the success of a grade 15 analyst in State Management." *Id.*

immediate termination of employment."[11]   Sommerkamp met shortly

afterwards with Kate Skelly of Liberty's Human Resources Department to

recommend that DiBlasi be placed on probation after the warning period

expired on March 21, 2011.   Skelly agreed that probation would be the

appropriate next step.

On the morning of March 18, 2011 – the final day of the 30-day warning

period – DiBlasi sent Sommerkamp a doctor's note stating that she was "unable

to work overtime due to ongoing medical problems." DiBlasi Dep. at 102, Ex.

14; *see also* Sommerkamp Aff. ¶ 25.   The doctor's note did not, however,

identify the nature of DiBlasi's medical issues.[12]

Sommerkamp forwarded the doctor's note to Skelly.  Sommerkamp and

Skelly then met with DiBlasi to obtain her consent to speak with her doctor

regarding any specific limitations that the doctor thought might be necessary.

They told DiBlasi that her "performance management process" would be stayed

---

[11] In response to Sommerkamp's criticism, DiBlasi testified that she
"began to work even longer hours" and "did exactly what Sommerkamp told
her to do." DiBlasi Aff. ¶ 49.  DiBlasi maintains that Sommerkamp was
"setting her up to fail, as he would insist that [her] work contained
miscalculations when there were none." *Id*. ¶ 53.

[12] Sommerkamp testified that he only learned that DiBlasi claimed to
suffer from complications arising from the medications she took to address her
endometriosis and an immune deficiency after DiBlasi initiated this litigation.
Sommerkamp Aff. ¶ 25.

11

and that she would not be placed on probation until her request for an accommodation was resolved.

Thereafter, DiBlasi's doctor informed Liberty that he believed she should only work five hours per day, four days per week, and with the possibility of telecommuting; and this accommodation should be kept in place at least through the end of June. On June 14, 2011, Skelly and Sommerkamp met with DiBlasi to confirm that her requested accommodation had been granted, but that because of her previous performance problems, she was being placed on probation for the coming thirty days. Sommerkamp then "significantly reduced" her workload. Sommerkamp Aff. ¶ 29. At the end of June, DiBlasi's doctor informed Liberty that her accommodation should continue through July. Skelly told DiBlasi that Liberty would honor the doctor's request.

Although disputed by DiBlasi, Liberty claims that during the 30-day probation period, DiBlasi missed multiple deadlines, delivered inaccurate or incomplete reports, and failed to provide the expected level of analysis. Sommerkamp Aff. ¶¶ 30-31; Def.'s Ex. A. As examples, Liberty cites DiBlasi's presentation regarding customer retention rates in New Mexico, which contained multiple errors, failed to address critical data, and simply copied recommendations from other state reports that Sommerkamp had provided. Liberty also cites a "state of the state" presentation for Oklahoma in which

DiBlasi failed to make note of the impact of recent major storms on Liberty's business. Sommerkamp Aff. ¶¶ 30-31, Ex. A at 00393.

In response, DiBlasi claims that Sommerkamp had given her permission to plagiarize the recommendations from other state reports and then chastised her for doing so. Pl.'s Resp. ¶ 97. DiBlasi contends that whenever she submitted her final version of a project, Sommerkamp would simply expand its scope. Despite DiBlasi's performance issues, Sommerkamp agreed to extend her probation period until the end of July. Liberty, on Sommerkamp's recommendation, among others, terminated DiBlasi's employment as of August 1, 2011.

## DISCUSSION

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although all reasonable inferences are drawn in the nonmovant's favor, the court cannot "'draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'" *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) (emphasis in original), quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007). "This is no less true in discrimination and

13

retaliation cases where motive is at issue; a nonmovant cannot rely 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Children's Place*, 740 F.3d at 796, quoting *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 855-856 (1st Cir. 2008).

### *Wage Claims*

DiBlasi claims that "from her first week of work onward" she was required to work in excess of forty hours per week in violation of state and federal wage laws. Sec. Am. Compl.¶¶ 58, 68. DiBlasi claims that, as the violations were "willful," she is now "entitled to compensation at one and a half times her regular rate of pay for all hours worked in excess of forty hours per week," plus treble damages and legal fees pursuant to Mass. Gen. Laws ch. 151, § 1A, and 29 U.S.C. § 207(a). *Id.* ¶¶ 59, 62, 69, and 72. Liberty counters that DiBlasi was a salaried employee ($88,000 per year) who fell within the administrative exemption to the overtime wage laws. *See* 29 C.F.R. §§ 541.600-602 ("An employee will be considered to be paid on a 'salary basis' . . . if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.").

The Fair Labor Standards Act (FLSA) requires employers to pay their

14

employees a minimum hourly wage and overtime compensation for more than forty hours per week of work. *See* 29 U.S.C. §§ 206, 207. An "employee" under the FLSA is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The Act exempts from this general rule certain so-called "white-collar" employees, i.e., "any employee employed in a bona fide executive, administrative, or professional capacity . . . ." *Id.* § 213(a)(1). Massachusetts has adopted the definition of "bona fide administrative employee" set out in the FLSA. *See* 455 Mass. Code Regs. § 2.02(3). Therefore, the court may apply the same analysis to both statutes. *See Cash v. Cycle Craft Co., Inc.*, 508 F.3d 680, 686-687 (1st Cir. 2007) ("The resolution of Cash's Fair Labor Standards Act claim determines his Massachusetts statutory claim."); *see also Swift v. AutoZone, Inc.*, 441 Mass. 443, 447 (2004) ("[T]he overtime provisions under State law were intended to be 'essentially identical' to Federal law . . . .").

The Department of Labor's FLSA regulations (issued pursuant to the statute's express rulemaking authority)[13] establish a three-prong test for

---

[13] "[T]he interpretive regulations are not conclusive, as they merely set forth the Secretary's official position on how the regulations should be applied in specific contexts. Even so, these interpretations have the 'power to persuade, if lacking power to control,' as they 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 8 (1st Cir. 1997), quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

15

determining whether an employee qualifies under the administrative exemption:

(a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management *or general business operations of the employer or the employer's customers*; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a) (emphasis added). "Because of the remedial nature of the statute, the Supreme Court has emphasized that the exemptions should be 'narrowly construed' and 'limited to those establishments plainly and unmistakably within their terms and spirit.'" *Hines v. State Room, Inc.*, 665 F.3d 235, 242 (1st Cir. 2011), quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). An employer defending a suit under the Act bears the burden of establishing that a particular employee's job falls within an exemption. *Hines,* 665 F.3d at 240; *see also John Alden Life Ins.*, 126 F.3d at 7.

Whether an exemption applies implicates questions of both fact and law. The question of how an employee spends her time is factual, while the issue of whether the nature of her work renders her exempt from the FLSA's overtime

16

requirement is a question of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *Clarke v. JPMorgan Chase Bank, N.A.*, 2010 WL 1379778, at *15 (S.D.N.Y. March 26, 2010). "An employees' exempt status depends less on [her] title, and more on the actual duties performed." *Harper v. Gov't Employees Ins. Co.*, 754 F. Supp. 2d 461, 463 (E.D.N.Y. 2010). There are

three distinct types of findings involved in determining whether an employee is exempt. First, the court must make findings concerning the so-called "historical facts" of the case, such as determining an employee's day-to-day duties. Second, the court must draw factual inferences from these historical facts, for instance, to conclude whether these day-to-day duties require "invention, imagination, or talent" as required by applicable regulations. Finally, the trial court must reach the ultimate conclusion of whether an employee is exempt, based on both historical facts and factual inferences.

*John Alden Life Ins.*, 126 F.3d at 7, quoting *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1073 (1st Cir. 1995).

That DiBlasi's position met the first two prongs of the test is apparent on its face. She earned $1,692.31 per week (well above the $455 weekly minimum) and she worked in an office-based management group responsible for maintaining the competitiveness of Liberty's products. With respect to this latter criterion, DiBlasi essays an argument that her work was not exempt by analogizing herself to the plaintiff insurance salesman in *John Alden*: "[I]n the case of an insurance company, the case-law is unequivocal that the 'products' at issue are 'the[] insurance policies themselves.'" Pl.'s Opp'n Mem. at 9, quoting

17

*John Alden*, 126 F.3d at 9. DiBlasi contends that her work did not involve management or general business operations, but was limited to "the 'production' of [Liberty's] insurance policies – the very commodity that [Liberty] exists to market. Every duty [she] performed resulted in changes to pricing, content or scope of product, whether due to regulatory changes or competition, and every action she performed required approval of her Manager, DSO, or other upper-level manager." Pl.'s Opp'n Mem. at 11.

The argument, however, does not survive the Department of Labor's regulatory description of job functions that are deemed "directly related to management or general business operations." 29 C.F.R. § 541.201. The pertinent regulation specifies as follows:

> (a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.
>
> (b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations;

18

government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

29 C.F.R. § 541.201. Among her other duties, DiBlasi monitored regulatory changes and their impact on the competitive environment in her assigned states. These tasks clearly fall within the defined categories of *marketing research* and *regulatory compliance*.

With regard to the third prong, Liberty must show that, in performing her job, DiBlasi exercised "discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.*[14]

[14]  The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; *whether the employee carries out major assignments in conducting the operations of*

19

Discretion and independent judgment is more than "applying well-established techniques, procedures or specific standards described in manuals or other sources . . . [or] recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." 29 C.F.R. § 541.202(e). While the term implies "authority to make an independent choice," that encompasses "decisions or recommendations reviewed at a higher level." 29 C.F.R. § 541.202(c).

DiBlasi claims that "[e]very time [she] effectuated a rate increase or compliance change, both of which were handed down by higher-level individuals, she followed a protocol set by management. The reports she

> *the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;* whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; *whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management;* and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b) (emphasis added).

20

prepared, including the SOS, were on templates into which she plugged data, and which were subject to three levels of scrutiny of review before dissemination." Pl.'s Opp'n Mem. at 13-14; DiBlasi Aff. ¶¶ 2-4. However, "'whether the employee has authority to commit the employer in matters that have significant financial impact' is a factor that the regulations instruct us to consider, it is not . . . a requirement that must be satisfied to demonstrate that an employee exercises independent judgment." *Hines*, 665 F.3d at 245, quoting 29 C.F.R. § 541.202(b). "The regulations likewise provide that an employee's discretionary actions need not 'have a finality that goes with unlimited authority and a complete absence of review.'" *Id*. at 246, quoting 29 C.F.R. § 541.202(c).

While Liberty generally agrees with DiBlasi's assessment as to *how* she performed her job, it argues that, notwithstanding, as a Senior Product Analyst the primary duties of her position required the exercise of discretion and independent judgment. Both of DiBlasi's immediate supervisors testified that, as a Senior Product Analyst, it was expected that DiBlasi would research and analyze the competitive landscape for personal insurance products in her assigned states and make recommendations regarding whether and how Liberty should respond to trends in those markets.[15]   Liberty Mutual expected that

---

[15] Both Sommerkamp and Downey held the position of Manager of Product Analysis and supervised DiBlasi – Sommerkamp from September of

21

DiBlasi's reports "would include not just an identification of trends, but also an analysis of the causes of those trends and recommendations as to whether and how Liberty Mutual should respond to them, e.g., by charging a different rate for a specific type of coverage." Sommerkamp Aff. ¶ 18; Downey Aff. ¶ 9. As Liberty aptly points out, because "DiBlasi was unwilling or unable to perform the [required] market analysis . . . she essentially is claiming that her poor performance necessarily converted her job from an exempt position to a non-exempt position." Def.'s Reply at 6.[16]

The most telling refutation of DiBlasi's non-exemption argument is found in her performance evaluations. As mentioned, DiBlasi's title was "Senior Product Analyst." While titles can be deceiving, DiBlasi's performance evaluations list among her job objectives, to –

2. Provide *analysis, recommendations and reports that effectively influence business decisions and processes of the state(s) and other functional areas of SBU.* When applicable, drive the

---

2009 to August of 2011, and Downey from January of 2009 to September of 2009. Both testified that "the most important aspect of [DiBlasi's] job was to analyze and research internal data and market trends for personal insurance products in her assigned states to ensure that Liberty Mutual achieved strong results in those states and its products remained competitive." Sommerkamp Aff. ¶ 6; Downey Aff. ¶ 5.

[16] Sommerkamp testified that DiBlasi "regularly failed to evaluate the root causes of, and provide recommendations on how Liberty Mutual should respond to various issues (e.g., a decrease in market share specific state)." Sommerkamp Aff. ¶ 14.

22

implementation; 3. Manage new/enhanced product implementation; 4. Effectively participate in *state(s) business planning process;* 5. *Develop and maintain competitive intelligence* and understand market trends; 6. Monitor and analyze state legislative and regulatory process (if necessary), *and ensure compliance with State rules and regulations . . . .*[17]

To achieve the desired "measure of success," DiBlasi was expected to "[f]ormulate and recommend sound pricing solutions, incorporating competitive rating plans and/or rate level when necessary." Sommerkamp Aff. Ex. 8. She was also required to "assist in the development and successful integration of [the] annual business plan; [e]ffective collaboration with DSO to identify problems and develop actionable solutions; provide thorough and timely assessments to DSO and State Management team, highlighting any emerging or known regulatory/legislative issues impacting [Liberty]; [a]ppropriate actions taken to maintain compliance with any changing regulations." *Id.* In 2009, the evaluation noted that DiBlasi was given the task of managing Liberty's second effort to submit a previously withdrawn Renters Tier filing in Washington. She was also charged with "conducting an auto retention analysis for Colorado, New Mexico and Oklahoma . . . [and to] suggest[] changes to billing and down payment requirements that should increase retention." *Id. See Harper v.*

---

[17] DiBlasi's managers completed two annual performance evaluations – OSPEs – during her 2½ years at Liberty.

*GEICO*, 754 F. Supp. 2d 461, 464 (E.D.N.Y. 2010), quoting 29 C.F.R. 541.202(c) ("The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.").

DiBlasi's 2010 evaluation equally reflects Liberty's expectation that she exercise discretion and independent judgment on matters directly related to Liberty's desire to remain competitive in the market sectors that DiBlasi was assigned to monitor.[18]   For example, it noted her "need to proactively recommend the strategy for the state review to the DSO" and that she had "[c]ompleted NM conversion analysis and identified major decline in fresh leads as driver of low field conversion. Reps are altering their quoting strategy as a result and conversion and production numbers should improve." Sommerkamp Aff. - Ex. 4. Sommerkamp commended her in this instance on "[c]omplet[ing] the high level analysis (CONMOK combined) and customized the initial analysis to reflect the particular issues in each state for the state-specific analyses." *Id.* However, he commented that DiBlasi "has done well on some projects, particularly research projects and projects with well-defined processes; [but] she

---

[18] In providing guidance as to the types of jobs exempt from the overtime wage laws, 29 C.F.R § 541.203(i), notes that a comparison shopper buyer "who evaluates reports on competitor prices to set the employer's prices generally meets the duties requirements for the administrative exemption."

24

has struggled with some projects with deliverables that are not part of a defined process and projects that are less-structured (E.g. NM conversion and NM retention). These types of projects are critical to the success of a grade 15 analyst in State Management." *Id.*

Also telling is DiBlasi's written response to the 2010 evaluation, in which she described her frustration at not being given proper credit for the discretionary tasks that she had performed. For example, she complained that she had been given a mark of only "Partially Met" in the category "effective[] participat[ion] in state(s) business planning process," while in her midyear assessment she had been told that she had "met expectations." DiBlasi also responded to Sommerkamp's criticisms regarding her failure to "[p]rovide analysis, recommendations and reports that effectively influence business decisions and processes of the states and other functional areas of the SBU," by claiming that she had "delivered several versions of action plans to my DSO, with the first one being delivered in September 2010. Most of the items have been implemented. The few outstanding items (setting direct bill to EFT targets with the Field, establishing points for performance, and establishing a touch-point program) are outside the scope of my authority to implement." *Id.* The record establishes that while DiBlasi worked for the decisionmakers at Liberty, she clearly was charged with analyzing data and then making recommendations

25

to them based upon that analysis. *See Harper v. GEICO*, 754 F. Supp. 2d 461, 464 (E.D.N.Y. 2010), quoting 29 C.F.R. 541.202(c) ("The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."). The evaluations make clear that DiBlasi had difficulty delivering on a regular basis and in a timely manner the level of analysis that her job demanded. On the undisputed facts, DiBlasi was an exempt employee under the FLSA, and no reasonable jury could conclude otherwise.

The court's disposition of DiBlasi's federal claims disposes of her state Wage Act claims as well. *See Hines*, 665 F.3d at 247.

### *FMLA Claims*

The FMLA establishes two distinct sets of rights: "prescriptive" rights creating substantive entitlements, and "proscriptive" rights providing protection for their exercise. *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 330 (1st Cir. 2005). The statute entitles an eligible employee to a total of twelve weeks of leave that may be taken intermittently for "a serious health condition." 29 U.S.C. § 2612(a)(1)(D). Citing section 105 of the FMLA and section 825.220(c) of its regulations, DiBlasi claims that Liberty, by "discouraging [her] exercise of FMLA leave both following her surgery and for necessary follow up medical appointments; issuing frivolous warnings regarding

26

her work performance; denying her a raise; and withholding a portion of her annual bonus, has unlawfully and willfully discriminated and retaliated against [her] for exercising rights guaranteed under the FMLA." Sec. Am. Compl. ¶ 77.

The regulation 29 C.F.R. § 825.220(c) provides:

An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

"To make out a prima facie case of [FMLA] retaliation, an employee must show that: (1) [s]he availed [her]self of a protected right under the FMLA, (2) [s]he was adversely affected by an employment decision, and (3) there was a 'but-for' causal connection between the protected conduct and the adverse employment action."[19] *Pagan-Colon v. Walgreens of San Patricio, Inc.*, 697 F.3d 1, 9 (1st Cir. 2012), as modified by *Univ. of Texas S.W. Med. Ctr. v. Nassar*,

---

[19] While DiBlasi claims FMLA interference in her Second Amended Complaint, in her Opposition Memorandum, DiBlasi does not offer any opposition to Liberty's argument. The court will thus deem the interference claim waived.

133 S. Ct. 2517, 2534 (2013).[20] If DiBlasi carries her weight, the burden shifts to Liberty to articulate a "legitimate reason" for the adverse employment decision. *Id.* at 9, quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998). This burden is simply one of production – if met (as it is in most cases), the it falls to DiBlasi to show that the reasons offered by Liberty are a pretext ginned up to disguise a retaliatory motive. *See id.* at 160-161.

The parties assume – perhaps too quickly in Liberty's case – that DiBlasi has made out a prima facie case of retaliation. Liberty cites poor performance as the nonretaliatory explanation for DiBlasi's minimal bonus, denial of a raise, and ultimate termination. Liberty argues that DiBlasi's job performance problems, which were amply documented in her first-year OSPE (performance evaluation), predated her first mention of FMLA leave. To reprise the salient chronological facts: DiBlasi began her employment at Liberty in January of 2009. Her first comprehensive employment evaluation, in January of 2010, gave her barely passing marks. DiBlasi took FMLA leave for surgery in June of 2010, and returned to work in August. On December 16, 2010, Sommerkamp

---

[20] While *Nassar* dealt with a Title VII employment discrimination claim, Justice Kennedy's observation that common-law "but-for" tort causation principles should be presumed to be the default rules adopted by Congress "absent an indication to the contrary in the statute itself," applies with equal force in the FMLA context. *Id.* at 2525.

met with DiBlasi to present her with a "performance plan" intended to address the criticisms of her work. The following day, Sommerkamp sent DiBlasi an email detailing her performance issues and laying out suggested remedial steps. On February 18, 2011, Sommerkamp met with DiBlasi and delivered a formal written performance warning, placing her on a thirty-day improvement plan. On the final day of the thirty-day probationary period, DiBlasi delivered a one-line note from her doctor stating simply: "The patient is unable to work overtime due to ongoing medical problems." DiBlasi Dep. - Ex. 14. Liberty responded by putting DiBlasi's probationary plan on hold while the possibility of an accommodation could be addressed. After obtaining further medical information from DiBlasi's physician, Liberty gave her a reduced work schedule of five hours a day, four days a week, while allowing her to work two of those days from home. DiBlasi was terminated on August 1, 2011.

On this record, it falls to DiBlasi to come forward with evidence from which a jury could reasonably conclude that Liberty fired her not for performance reasons, but in retaliation for requesting and taking FMLA leave. *See Hodgens*, 144 F.3d at 170. As evidence of pretext, DiBlasi proffers the following:

> Prior to asking for medical leave, DiBlasi had been told by her then-manager (Downey) that her performance met all Liberty's expectations. SDF ¶ 21-22.

29

Following her transfer to the new team, DiBlasi told Sommerkamp that she needed leave for surgery, which was originally scheduled for November of 2009, but rescheduled for March of 2010 and then July of 2010, when it was finally performed. SDF ¶¶ 25-26.

Sommerkamp clearly disapproved of DiBlasi's FMLA leave which he called her "vacation" – even complaining to DiBlasi about the disruption it would cause him – and the post-surgical medical appointments that she was required to attend. SDF ¶¶ 36-38.

Sommerkamp also balked at the follow-up appointments that DiBlasi required after her return to work – despite the fact that Liberty's Human Resources Department assured her that the appointments were

Sommerkamp also made negative comments in her review based on a planning process that occurred while she was out on FMLA leave. Throughout her employment, despite Liberty's current dire assessment of her abilities and performance, DiBlasi always received performance scores within the "Range of Effective Performance," as defined by Liberty itself, permitting an inference that, absent additional factors like her disability and need for medical leave, her level of performance would not have subjected her to termination. SDF ¶¶ 28, 44.

Though Liberty did implement an accommodation for DiBlasi on June 14, 2011 (three months after she requested it), she was informed that her performance probation would begin at the same time as the accommodation. In short, she had to exceed her prior work performance in a period in which her hours had been reduced in order to keep her job. This, coupled with Sommerkamp's continued expansion of the scope of her projects and changing expectations, led to a situation that could be construed as setting her up for failure. SDF ¶¶ 51-54, 57-59.

The court will address each of DiBlasi's proffers in turn. Downey, who was

DiBlasi's manager from January to September of 2009, testified that over the

months she "became concerned about the timeliness of [DiBlasi's] work. DiBlasi

30

worked slowly and had difficulty meeting deadlines, even on relatively simple projects." Downey Aff. ¶ 11. Downey complained that DiBlasi had omitted critical components of a filing in the State of Washington rendering it unusable and, as DiBlasi had left on vacation, Downey and a colleague had to complete the project on their own. *Id.* ¶ 12. Downey testified that she had told Diblasi on her return "that this type of conduct was completely unacceptable and that she needed to communicate with [Downey] if she anticipated any difficulty in meeting deadlines or didn't understand a process or what was expected of her." *Id.* Downing states that DiBlasi and Denise Kelly, Director of State Operations for Washington, had "developed a strained working relationship due, in part, to DiBlasi's performance issues." *Id.* ¶ 13. DiBlasi's 2009 evaluation explained that

> Claudia needs to push the results and the implementation of this analysis at a faster rate in order to impact 2010 retention, as she has had this project on her plate since November and has not completed a retention game plan as of the end of December.

Sommerkamp Aff. - Ex. 8. As to another project,

> Claudia worked on the WA NBRA, but did not meet expectations. Key Parties were not given the information they needed to know ahead of time, she did not contact the research team and did not create the filing materials. Claudia left for [vacation] without completing the project or communicating the status of the project to her manager at the time. Her manager and teammate at the time had to finish the project while Claudia was on [vacation].

*Id.*

With regard to the FMLA leave request, DiBlasi alleges that she informed Sommerkamp in November of 2009 that she would require a medical leave to undergo surgery on her leg. Sommerkamp testified that DiBlasi first told him of the possibility of leg surgery in February of 2010. The conflict in dates notwithstanding, Downey and Kelly's criticisms of DiBlasi's performance were documented prior to any indication on DiBlasi's part that she intended to request FMLA leave.[21]

DiBlasi next argues that pretext explains Sommerkamp's displeasure at her absence, specifically that her referred to her FMLA leave as a "vacation," and complained about the disruption that it would cause in the workplace. Pl.'s SOF ¶¶ 36-37. She also asserts that he "balked" at her post-surgery physical therapy appointments. Pl.'s SOF ¶ 38. DiBlasi's only evidence that this was true is her own deposition testimony, which is so thin that it is worth quoting at length.

Q. And did you tell Mr. Sommerkamp that you needed a leave?
A. Yes.

Q. What did he say in response, if anything?

_____

[21] Downey testified (without contradiction) that when DiBlasi began her employment at Liberty, she requested that her work station have a footrest. Downey arranged an ergonomic consultation in response. DiBlasi never told Downey that she "had any kind of medical condition that might affect her job performance." Downey Aff. ¶ 20.

32

A. I don't recall.

Q. Did you tell him why you needed the leave?
A. I don't recall.

Q. After your surgery, did you need to undergo any physical therapy?
A. Yes.

Q. How often did you have to go for physical therapy?
A. I believe it was once a week.

Q. For how many weeks?
A. I don't recall.

Q. Was it just in 2010?
A. I don't recall.

Q. How long were the physical therapy appointments?
A. I don't recall.

Q. Do you recall where they were?
A. I took some of them at a Post Office Square location. And there was a second location, but I don't remember what it was.

Q. Did you use any of your FMLA leave to attend those physical therapy appointments?
A. I think just once.

Q. Were your physical therapy appointments during the workday?
A. I tried to schedule them before work or after work.

Q. And did you discuss with Gifford Sommerkamp your need for physical therapy?
A. I know I mentioned it to him.

Q. Do you recall what he said in response, if anything?
A. I don't recall his words. He was disapproving and unhappy about it.

Q. You don't recall Mr. Sommerkamp's words?
A. No.

Q. But you said he was disapproving and unhappy about it?
A. Yes.

Q. And what led you to believe that he was disapproving and unhappy about it?
A. The expression on his face.

Q. Can you describe for me as best as you can the expression on his face?
A. I don't exactly -- I don't remember it exactly. That was my impression at the time.

Q. And your impression was based on the expression on his face?
A. Yes.

Q. Was it based on anything else?
A. I don't recall our conversation about it.

Q. So as you sit here today, you're telling me that you believe that Gifford Sommerkamp was disapproving and unhappy about it because of the expression on his face?
A. Yes.

Q. And you don't remember the words that were used during this conversation with Gifford?
A. I don't recall them.

Q. How many times did you discuss your need for physical therapy with Gifford Sommerkamp?

A. I don't recall.

Q. Do you recall any conversations other than the one that we were just discussing about your need for physical therapy?

A. No.

Q. In your conversation with Gifford Sommerkamp, did you ask him if it was okay for you to take time for your physical therapy appointments?

A. I don't remember the content of the conversation.

Q. Just so we're clear, you testified that based on his facial expression, Mr. Sommerkamp was disapproving and unhappy about your need to take time off for physical therapy. Did he express to you any feelings about your need for your FMLA leave for your surgery?

A. He mentioned to me that it was disruptive. This was before I went out. That it was disruptive to projects and to the flow of work for me to take time off.

Q. And when was this conversation?

A. I only recall that it was before I took time off. I don't know the date.

Q. And who else was present for this conversation?

A. It was just the two of us.

Q. Where was the conversation?

A. In his office.

Q. What else did he say during this conversation?

A. I don't recall.

Q. Do you recall anything that you said during this conversation?
A. I don't.

DiBlasi Dep. at 64-68.

Even if a plaintiff's interpretation of her supervisor's facial expressions constitutes competent evidence of an employer's state of mind, mere expressions of managerial concern at the potential disruption to the workplace caused by an employee's absence do not. *See Brookins v. Staples Contract & Commercial, Inc.*, 2013 WL 500874, at *6 (D. Mass. Feb. 12, 2013) ("[I]f a plaintiff could show pretext just by showing her FMLA leave caused managerial problems, summary judgment could almost never enter on FMLA retaliation claims. Nearly every supervisor receiving a FMLA leave request will face managerial challenges . . . ."); *cf. Keeler v. Putnam Fid. Trust Co.*, 238 F.3d 5, 10 (1st Cir. 2001) ("An employee's use of leave, while fully legitimate, can cause serious problems for the employee's performance of his tasks and require an employer to implement changes in how jobs are assigned and who does what within the organization.").[22]

---

[22] DiBlasi's remaining complaints about Sommerkamp that rely on this testimony deserve short shrift. DiBlasi admits that only one of her physical therapy appointments required FMLA leave during the work day. Her complaint that Sommerkamp's critical comments about her lack of participation in the team's planning process failed to take account of the fact that she was out on FMLA leave were addressed by Sommerkamp who, when DiBlasi raised the issue, amended her performance review: "Given that you

A final consideration on the issue of "but-for" causation is timing. DiBlasi's FMLA leave (which was granted for the requested six weeks) occurred in the summer of 2010. DiBlasi was terminated in August of 2011. While temporal proximity between an employee's taking FMLA leave and her discharge will not ordinarily by itself establish pretext, when combined with other facts, it may suffice to tip the balance. *Colburn*, 429 F.3d at 331, citing *Hodgens*, 144 F.3d at 159-160 & n.4. Where temporal proximity is the only evidence of any significance suggestive of retaliation, the proximity must be "very close." *Bishop v. Bell Atl. Corp.*, 299 F.3d 53, 60 (1st Cir. 2002) (a one-year gap between protected activity and adverse action is too wide to establish temporal proximity), quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam); *see also Bennett v. Saint-Gobain Corp.*, 507 F.3d 23 (1st Cir. 2007) (sixteen months, intervening positive evaluation inadequate as evidence of pretext); *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) (nine months insufficiently proximate). Because DiBlasi's termination occurred more than a year after she took FMLA leave, the temporal connection alone is inadequate to support a showing of pretext. In sum, DiBlasi has failed to proffer

were out on STD for *part* of the planning process this will be changed to N/A." Sommerkamp Dep. - Ex. 8 at 2.

evidence sufficient to establish a threshold case that retaliation for her FMLA

leave was the "but-for" cause of her termination.[23]

### *ADA and Chapter 151B claims*

The ADA prohibits an employer from discriminating against a qualified

---

[23] The "but-for" standard is more demanding than the prior Title VII "one among other motives" causation standard for establishing status discrimination, and intentionally so. As the Supreme Court observed in *Nassar*, in rejecting the application of a status standard to retaliation claims, in words apt in this case:

> In addition lessening the causation standard could also contribute to the filing of frivolous claims, which would siphon resources from efforts by employer, administrative agencies, and courts to combat workplace harassment. Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location. To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation. If respondent were to prevail in his argument here, that claim could be established by a lessened causation standard, all in order to prevent the undesired change in employment circumstances. Even if the employer could escape judgment after trial, the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgment stage. It would be inconsistent with the structure and operation of Title VII to so raise the costs, both financial and reputational, on an employer whose actions were not in fact the result of any discriminatory or retaliatory intent.

133 S. Ct. at 2531-2532 (internal citation omitted).

38

person with a disability in regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment" because of his or her disability. 42 U.S.C. § 12112(a). Similarly, Chapter 151 B prohibits the same types of discrimination under state law. In construing Chapter 151B, Massachusetts courts are guided by case law construing the federal Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 816 n.5 (1997); *Garrity v. United Airlines, Inc.*, 421 Mass. 55, 59 (1995). This deference to federal law includes, as in the case of DiBlasi's FMLA claim, the utilization of the *McDonnell Douglas* burden-shifting framework. *See Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st Cir. 2005).

To establish a prima facie case of discrimination, DiBlasi must show that: "(1) [she] suffers from a disability or handicap, as defined by the ADA and Chapter 151 B, that (2) [she] was nevertheless able to perform the essential functions of her job, either with or without reasonable accommodation, and that (3) [Liberty] took an adverse employment action against her because of, in whole or in part, her protected disability." *Id.* at 104 (citing cases). Assuming a prima facie case, Liberty has the burden of articulating a legitimate, non-discriminatory reason for DiBlasi's termination (which it has previously,

that is, poor performance), leaving DiBlasi to prove that Liberty's explanation is mere pretext for discriminatory animus. "The ultimate burden of proving unlawful discrimination rests at all times with [the plaintiff]." *Id.* at 105, citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

DiBlasi must first show that she suffers from a handicap or disability as defined by Chapter 151B and the ADA. Under Massachusetts law, "handicap" is defined as: "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarding as having such impairment . . . . " Mass. Gen. Laws ch. 151B, § 1(17); *see also* 42 U.S.C. § 12102(2) (similarly defining "disability" under federal scheme). A "handicapped person" is defined as any person who has a "handicap" under that statutory definition. Mass. Gen. Laws ch. 151B, § 1(19). To qualify under Chapter 151B, DiBlasi must satisfy a three-step analysis: (1) "whether [her] condition, actual or perceived, constitutes a mental or physical 'impairment'"; (2) "whether the life activity curtailed constitutes a 'major' life activity as defined in [M.]G.L. c. 151B, § 1(20), and its accompanying regulations"; and (3) "whether the impairment substantially limited the major life activity." *City of New Bedford v. Mass. Comm'n Against Discrimination*, 440 Mass. 450, 463 (2003); *see also Carroll v. Xerox Corp.*, 294 F.3d 231, 238 n.3 (1st Cir. 2002) (noting that, with some exceptions, the definitions of

40

"disability" under federal law are virtually identical to the definitions of "handicap" under Massachusetts law). "'[M]ajor life activities' means functions, including, but not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Mass. Gen. Laws ch. 151 B, § 1(20). Further, a "substantial" limitation does not include any impairment which interferes "in only a minor way with the performance of manual tasks." *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 175-176 (1st Cir. 2003).[24]

For purposes of this motion, Liberty – again too quickly – assumes that DiBlasi has made out a prima facie case of handicap discrimination. Liberty's stated reasons for disciplining and terminating DiBlasi – her failures to meet deadlines, failure to provide the higher-level analysis and recommendations required of her position, and inaccuracies in her work – easily satisfy its burden, thus shifting the focus to whether DiBlasi has produced evidence demonstrating that discriminatory animus was Liberty's true motive. To this end, DiBlasi

---

[24] Although never clearly stated in her Second Amended Complaint or her Opposition Memorandum, it appears that DiBlasi is asserting that her disability is her endometriosis, and the side effects she allegedly suffered when her treatment medications were changed in January of 2011, to which she added Prozac in February of 2011. Those include "marked drowsiness, blurred vision, vertigo, and difficulty with memory, which began to negatively affect her work performance." Sec. Am. Compl. ¶ 38. As Liberty acquiesces to a prima facie case, DiBlasi presents no evidence of her "handicap."

41

argues that

> [b]ased on Sommerkamp's negative comments and the fact that
> [Liberty's] negative view of DiBlasi coincides in time with her
> requests for medical leave and disability accommodation, it is more
> than reasonable to infer that DiBlasi's accommodation for no
> overtime and a reduced workweek created a disruption that
> Sommerkamp resented – and that his resentment of DiBlasi as a
> disabled person needing medical treatment and accommodation was
> the primary motivation for his decision to fire her.

Opp'n Mem. at 18.

Again, the time line does not support DiBlasi's argument. Her request for

FMLA leave was made in March of 2011, long after her performance problems

had been documented. Of even greater significance is the undisputed fact that

Sommerkamp had no knowledge of DiBlasi's medical condition or that she was

claiming a "disability" in requesting FMLA leave for orthopedic surgery on her

leg in 2010 (a fairly common surgery that is not usually associated with a

handicap). The medical records that DiBlasi submitted to Liberty in support of

her application for her short term disability benefits during her FMLA leave

period indicated a "left ankle arthrotomy" related to a prior "tibial fracture"

suffered in a motor vehicle accident in 1988. Labrie Aff. - Ex. A. Although

DiBlasi claims that she suffered from endometriosis throughout her employment

at Liberty, her formal request for an accommodation filed on March 18, 2011,

simply stated that she was "unable to work overtime due to ongoing medical

problems." "At the most basic level, it is intuitively clear when viewing the ADA's language . . . that an employer cannot fire an employee 'because of' a disability unless it knows of the disability." *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995). *See Morisky v. Broward Cnty.*, 80 F.3d 445, 448 (11th Cir. 1996) ("Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA."); *Sever v. Henderson*, 381 F. Supp. 2d 405, 418 (M.D. Pa. 2005) ("[S]imply informing an employer of a particular condition is not tantamount to providing the employer with knowledge that the employee is substantially limited in some major life activity."); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 950 (N.D. Ga. 1995) (holding that, even if the employer was on notice that the plaintiff "had some type of stress-related medical condition[,] [t]hat alone is not sufficient to give notice of a covered disability for purposes of an ADA claim") (internal citation omitted); *McIntyre v. Kroger Co.*, 863 F. Supp. 355, 359 (N.D. Tex. 1994) (holding that the plaintiff's doctor's note and request for leave did not put his employer on notice that he had a disability). In the absence of such notice, DiBlasi's disability discrimination claim fails as a matter of law.

## ORDER

For the foregoing reasons, Liberty's motion for summary judgment is

ALLOWED.  The Clerk will enter judgment for Liberty on all claims and close the case.

SO ORDERED.

/s/ Richard G. Stearns

UNITED STATES DISTRICT JUDGE